UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                                        )
LOUIS A. MANDARINI III et al.,          )
                                        )
        Plaintiffs,                     )
                                        )
v.                                      )        Civil No. 17-11123-LTS
                                        )
ACCURATE ENGINEERED                     )
CONCRETE, INC. and FRANK J.             )
FRANZONE, INC.,                         )
                                        )
        Defendants.                     )
                                        )
```

MEMORANDUM AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT
(DOC. NOS. 66, 89)

December 31, 2019

SOROKIN, J.

      Pending before the Court are the parties' cross-motions for summary judgment.

Doc. No. 66; Doc. No. 89.[1]  The parties' various motions to strike and to quash (Doc. Nos. 94, 95,

108, 116) are resolved in a separate Order also issuing today.  The motions are fully briefed, and

the Court held oral argument on December 6, 2019.

I.      BACKGROUND

      Plaintiff Louis Mandarini III ("Mandarini") is the Executive Director of the Massachusetts

Laborers' Health and Welfare Fund, the Massachusetts Laborers' Pension Fund, and the

Massachusetts Laborers' Annuity Fund.  Plaintiff James Merloni ("Merloni") is the Administrator

of the New England Laborers Training Trust Fund.  Plaintiff Joseph Bonfiglio ("Bonfiglio") is a

---

[1]      Citations to "Doc. No. __" reference documents appearing on the court's electronic docketing system;
pincites are to the pages numbers in the ECF header.

Trustee of the Massachusetts Laborers' Legal Services Fund. Plaintiffs bring this action on behalf of and for the benefit of their employee benefit plans (collectively, "the Funds") under section 515 of the Employment Retirement Income Security Act of 1974 (ERISA) seeking to recover contributions Defendants Accurate Engineered Concrete, Inc. ("Accurate") and Frank J. Franzone, Inc., d/b/a Engineered Concrete Inc. ("Engineered") allegedly owe them.

The Funds are "employee benefit plans" within the meaning of Section 3 of ERISA, see 29 U.S.C. § 1002, and are third-party beneficiaries of collective bargaining agreements (CBAs) between Defendant Accurate and the Massachusetts & Northern New England Laborer's District Council (the union).[2] The Funds provide participants and beneficiaries with various benefits, including retirement pensions, health insurance, dental and prescription drug benefits, accident and disability benefits, training, and legal services. These benefits are funded through contributions signatory employers—employers who have signed on to one or more CBAs—make to the Funds. Workers then receive credit towards various benefits based on hours worked. To qualify for such benefits, workers must work a certain number of creditable hours per year.

Section 515 of ERISA provides that "[e]very employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement." 29 U.S.C. § 1145. The collectively bargained agreements at issue in this action require employers to make contributions, at rates specified by the agreements, to each of the Funds for each hour their employees worked for them.

---

[2] Unless otherwise noted, references herein to "the union" are to the Massachusetts & Northern New England Laborer's District Council; references to "union laborers" are to employees classified as "laborers" by Defendants who are members of the union; references to "union jobs" and "non-union jobs" are to work performed pursuant to contracts between Defendants and contractors requiring union or non-union laborers respectively.

Defendant Engineered was incorporated in 1973; Defendant Accurate was incorporated in 1991. Both Defendants were at all relevant times owned by Mr. Frank Franzone.[3] Defendant Engineered is not a signatory to any CBA. Accurate entered into the following three CBAs with the union in 1992: (1) by and between the Associated General Contractors Association of Massachusetts, Inc. and the Building Trades Employers' Association of Boston and Eastern Massachusetts, Inc. ("the Eastern Massachusetts Building and Site Construction CBA"); (2) by and between the General Contractors' Association of Pittsfield, Massachusetts, Inc.; and (3) by and between the Construction Industries Association of Western Massachusetts, Inc. (together, "the CBAs at issue").[4] The three CBAs at issue required Accurate to remit monthly contributions to the Funds in proportion to the hours its employees worked each month.

Between 2011 and 2018, Defendant Accurate remitted to the Funds contributions for hours worked by its union-member employees on union jobs. Defendants did not report, and remitted no contributions for, any hours their employees, whether union members or not, worked for Defendant Engineered (the non-signatory) during that time.

Plaintiffs have moved for summary judgment on liability and damages that both Defendants are liable for violating the CBAs at issue and section 515 of ERISA for failure to remit contributions for work performed by Engineered, due to them from January 1, 2011 through the end of August 2018, when both Defendants ceased operations. The central question is whether

---

[3] Defendants do not dispute that Mr. Franzone was at all relevant times the majority owner of the two companies. However, relying on certain statements Mr. Franzone submitted in support of their summary judgment motion, Defendants dispute that Mr. Franzone was at all times their sole owner. Because Mr. Franzone's affidavit statements contradict his sworn deposition testimony and answers to interrogatories, the Court has stricken the statements in question. See Doc. No. 127 (Order on Motion to Strike).

[4] Although Plaintiffs are enforcing all three CBAs at issue in this action, they note that "Defendants' records . . . do not indicate that they had actionable work" in the areas covered by the latter two CBAs. Doc. No. 119 at 10. Therefore, Plaintiffs present evidence only with respect to the Defendants' alleged failure to comply with the first CBA—the Eastern Massachusetts Building and Site Construction CBA.

Plaintiffs can apply the CBAs at issue to Engineered, a conceded non-signatory to those agreements. Defendants oppose and cross-move for summary judgment on liability.

II.     LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once a party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party, who "may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial." Barbour v. Dynamics Research Corp., 63 F.3d 32, 37 (1st Cir. 1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)). A court may enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

On a motion for summary judgment, courts are "obliged to view the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor." LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993). At the same time, courts may not credit "conclusory allegations, improbable inferences, and unsupported speculation." Prescott v. Higgins, 538 F.3d 32, 39 (1st Cir. 2008). When cross-motions for summary judgment are presented, courts "must consider each motion separately" and draw all inferences against each moving party in turn. Reich v. John Alden Life Ins. Co., 126 F.3d 1, 6 (1st Cir. 1997).

III.    <u>DISCUSSION</u>

The Court first addresses two preliminary objections Defendants advance in opposition to Plaintiffs' motion for summary judgment and in support of their own motion that challenge Plaintiffs' authority to bring this lawsuit.  Neither objection has merit.

A.    <u>Standing</u>

Defendants contend Plaintiffs lack standing to bring this action.  They argue that Plaintiff Mandarini is not a fiduciary and thus is not authorized to file suit on behalf of any of the Funds for which he is Executive Director.  <u>Doc. No. 90 at 2-4</u>.  This argument borders on the frivolous. "ERISA . . . defines 'fiduciary' not in terms of formal trusteeship, but in functional terms of control and authority over the plan."  <u>Mertens v. Hewitt Assocs.</u>, 508 U.S. 248, 262 (1993) (citing 29 U.S.C. § 1002(21)(A)).  "The key determinant of whether a person qualifies as a functional fiduciary is whether that person exercises discretionary authority in respect to, or meaningful control over, an ERISA plan, its administration, or its assets."  <u>Beddall v. State St. Bank & Trust Co.</u>, 137 F.3d 12, 18 (1st Cir. 1998).  Here, the undisputed evidence establishes that Mandarini is the Executive Director of each of the three Funds on whose behalf he sues, <u>Doc. No. 69</u> (Mandarini Aff.) ¶ 1, and that the Trustees delegated authority to the Executive Director and their authorized representatives to collect contributions, perform audits, and bring lawsuits and enforcement actions to recover delinquent contributions, <u>Doc. No. 69-1</u> (Eastern Massachusetts Building and Site Construction CBA, June 1, 2012 – May 31, 2016) Art. XIX; <u>Doc. No. 69-2</u> (Eastern Massachusetts Building and Site Construction CBA, June 1, 2016 – May 31, 2020) Art. XIX; <u>Doc. No. 90-6</u> (Mandarini Dep. Tr.) at 6 (13:19 – 16:17).  In his capacity as Executive Director, Mandarini is charged with seeking unpaid employer pension contributions to the Funds, and he has been authorized to do so by the Trustees.  <u>Id.</u>  Defendants concede that a fiduciary would rightfully have

standing in this action, Doc. No. 90 at 3, but they offer no evidence suggesting Mandarini is not a fiduciary or is without authority from the Trustees to bring suit on behalf of the Funds.

Defendants make much of the fact that the minutes of Trustee meetings allegedly fail to specifically authorize Mandarini to bring this lawsuit. Doc. No. 114 at 3. To the extent that Defendants contend that Mandarini lacks standing because there seems to be a lack of express authorization on the part of the Funds' Trustees authorizing Mandarini to bring actions on their behalf, the Court notes that Mandarini's authority to pursue unpaid employer contributions derives from the Trust Agreement, which states in relevant part that "Trustees or their authorized representatives" can audit employer contributions and that "[s]uch examinations may be implemented by the Trustees' authorized representatives in connection with the proper administration of the Funds." Doc. No. 69-1 at 37 (Art. XIX); Doc. No. 69-2 (same). Moreover, Mandarini testified under oath that the Trustees do not separately authorize every individual lawsuit, but instead generally authorize him to bring lawsuits and collect delinquent contributions. Doc. No. 90-6 (Mandarini Dep. Tr.) at 6 (13:19 – 16:17). Nothing more is required. In any event, Defendants offer no contrary evidence. Mandarini plainly has standing to bring this action.

Defendants also contend that Plaintiffs Merloni and Bonfiglio lack standing because they have provided no evidence that Mandarini can bring suit on their behalf. Doc. No. 90 at 1-2. Like Defendants' argument respecting Mandarini, this argument has no merit. Plaintiffs submit evidence, which Defendants neither dispute or contradict, that the five Funds work together, collect contributions in the form of a single check that is later distributed among them pro rata as appropriate, and authorize Mandarini to act on their collective behalf. The collection activity of all five Funds involved in this case is centralized in the Massachusetts Laborers' Benefits Fund Office, of which Mandarini is the head. The centralization of the collection activity is authorized

by the Trust Agreements of the Funds, including the Training and Legal Services Funds. Plaintiffs explain and establish these points clearly in their papers.[5] See Doc. No. 105 at 19–22; Doc. No. 90-6 (Mandarini Dep. Tr.) at 8-9 (23:9 – 27:2). Merloni and Bonfiglio, like Mandarini, have standing to bring this action.

In any event, Defendants have waived their argument that Plaintiffs lack standing. Defendants correctly note that they asserted standing as an affirmative defense in their Answers to the Complaint. Doc. No. 90 at 4 n.2; see also Doc. No. 7 at 4 (Affirmative Defense 2) and Doc. No. 8 at 4 (same). However, instead of responding substantively to an interrogatory seeking "all factual bases for your denial of allegations in the Complaint and our Affirmative Defenses asserted in this matter," Defendants objected to the interrogatory as overbroad, vague, unduly burdensome and not a single interrogatory. Doc. No. 106-8 at 10 (Resp. to Interrogatory No. 19). A defendant may not assert an affirmative defense, unreasonably refuse to answer discovery, and then, as here, seek summary judgment on that defense. In these circumstances, Defendants have waived their argument that Plaintiffs lack standing.[6] Fed. R. Civ. P. 37(c).

For these reasons, Defendants' motion for summary judgment that the Plaintiffs lack standing to bring this action is DENIED and the Court determines that Plaintiffs have standing to proceed.

---

[5] Defendants also note in their statement of facts that Merloni and Bonfiglio did not submit separate damage assessments in this case. Doc. No. 106 ¶ 106–08. Plaintiffs have shown, however, that Mandarini's office is responsible for collections on behalf of all five Funds, and that the damages assessment he signed is made on behalf of all of them, as authorized by the Trustees. Id. (responses); Doc. No. 90-6 (Mandarini Dep. Tr.) at 8-9 (23:9 – 27:2).

[6] Defendants contend that "[t]he Plaintiffs *never* asked the Defendants anything about this or any other affirmative defense as a review of Exhibit H to the SOF [Doc. No. 106-8], which the Plaintiffs themselves refer to, proves." Doc. No. 114 at 4 (emphasis in original). In the face of the record described above, Defendants' contention borders on a violation of Rule 11.

B. Collective Bargaining Agreements

Next, Defendants argue that "Plaintiffs' claims should be dismissed because there is no evidence that Accurate agreed to the CBAs at issue." Doc. No. 90 at 4. Like Defendants' standing argument, this argument also borders on the frivolous. The undisputed evidence establishes that on February 24, 1992, Raymond Griskiewicz of Accurate, signed the original Acceptance of Agreement(s) and Declarations of Trust document ("Acceptance Agreement") binding Accurate to the collective bargaining agreements at issue in this action. Doc. No. 69-8 (Acceptance Agreement). The next day, on February 25, 1992, Griskiewicz signed the union on-boarding questionnaire on behalf of Accurate. Doc. No. 105-4. The Acceptance Agreement bound Accurate to the CBAs at issue in this action and to their successive iterations unless Accurate terminated them in writing. Doc. No. 69-8 ¶ 1. There is no evidence Accurate ever terminated any CBA. Accurate neither contends otherwise nor submits any contrary evidence. These facts alone more than suffice to establish that Accurate is bound by the CBAs at issue. But there is more: Mr. Franzone testified that Accurate signed the 1992 Acceptance Agreement, that "Accurate is strictly for union", and that Accurate is "definitely a union company." Doc. No. 106-2 (Franzone Dep. Tr.) at 12 (38:19-21); id. at 7 (18:12); id. at 9 (27:12-13). None of these additional facts is disputed.

Nonetheless, Defendants note that "[t]he 1992 acceptance agreement listed six CBAs and expressly instructed Accurate to circle and initial which CBAs it agreed to bind itself to. There are no circles or initials and instead only checkmarks near three of the CBAs."[7] Doc. No. 90 at 4; see also Doc. No. 69-8 (the Acceptance Agreement). Defendants argue that because the CBAs at issue here were identified by check marks and not by circles, there is no evidence that Accurate

---

[7] The CBAs identified by check marks are the CBAs at issue in this action. See supra at 3.

accepted to be bound by them.[8] <u>Doc. No. 90 at 4</u>. Defendants identify no substantive difference between checkmarks and circles. They suggest that Accurate's identification of the CBAs to which it agreed to be bound by checkmarks rather than circles somehow operates to negate its agreement as if it were a child crossing his fingers when making promises. Such a suggestion—especially in the face of Accurate's adherence to the CBAs for close to three decades—is utterly without merit. Therefore, the Court DENIES Defendants' motion for summary judgment that they are not bound to the CBAs at issue and determines that Accurate is bound by the three CBAs advanced by Plaintiffs.

     C. <u>Liability</u>

Plaintiffs have moved for summary judgment that Defendants have violated the CBAs and Section 515 of ERISA and seek to recover contributions from work performed by Engineered under two theories of liability—the alter ego theory and the single employer theory. <u>Doc. No. 68</u>. Defendants oppose Plaintiffs' motion and have cross-moved for summary judgment on both theories of liability. <u>Doc. No. 90</u>. The Court addresses first the parties' respective arguments under the alter ego theory of liability.

     1. <u>Alter ego theory of liability</u>

       a. <u>Legal Standard</u>

The First Circuit has held that the corporate form may be disregarded in certain ERISA actions for unpaid employee benefits. <u>See</u> <u>Massachusetts Carpenters Cent. Collection Agency v.</u>

---

[8]     In their reply, Defendants concede they are bound by the Acceptance Agreement but they "dispute that Accurate made or otherwise authorized the checkmarks and thereby aged to be bound by the two specific CBAs, the Eastern Massachusetts type CBAs" that Plaintiffs seek to enforce. <u>Doc. No. 114 at 9</u>. The Court STRIKES this assertion. Defendants cite nothing to support it. <u>See</u> Local R. 7.1(b)(2) (stating in relevant part that "[a]ffidavits and other documents setting forth or evidencing facts on which the opposition is based shall be filed with the opposition."). In any event, this unsupported assertion in the face of the evidence described above does not create a genuine issue of material fact.

Belmont Concrete Corp., 139 F.3d 304, 308 (1st Cir. 1998) ("[U]nderlying congressional policy behind ERISA clearly favors the disregard of the corporate entity in cases where employees are denied their pension benefits.") (internal quotation marks and citation omitted); Pension Benefit Guar. Corp. v. Ouimet Corp., 711 F.2d 1085, 1093 (1st Cir. 1983) ("[C]oncerns for corporate separateness are secondary to what we view as the mandate of ERISA . . ."). One theory of liability under which the corporate form may be disregarded is the alter ego theory,[9] which is often applied in what have come to be known as "double-breasted operations."

A double-breasted operation is an enterprise comprised of both union and non-union companies in which the non-union company bids on contracts that do not require a union contractor and the union company bids on union contracts. Mass. Carpenters Cent. Collection Agency v. A.A. Bldg. Erectors, Inc., 343 F.3d 18, 22 (1st Cir. 2003) (citing C.E.K. Indus. Mech. Contractors, Inc. v. NLRB, 921 F.2d 350, 352 n.3 (1st Cir. 1990)). Such double-breasted enterprises are "neither uncommon nor inherently unlawful." Id.

Nevertheless, under the alter ego theory, civil liability for benefit contributions pursuant to a collective bargaining agreement may be imposed on one part of the double-breasted operation that is not itself a signatory to the agreement if the operation is used to evade the obligations of the other part, which is a signatory. Belmont Concrete Corp., 139 F.3d at 307-08. "A finding that two

---

[9]     "Although developed in the labor law context, alter ego or successor liability analysis has been applied to claims involving employee benefit funds brought under ERISA. . ." Belmont Concrete Corp., 139 F.3d at 308. In ERISA actions, federal common law governs the alter ego analysis. United Elec., Radio & Machine Workers of Am. v. 163 Pleasant St. Corp., 960 F.2d 1080, 1092 (1st Cir. 1992); see also Brotherhood of Locomotive Eng'rs v. Springfield Terminal Ry. Co., 210 F.3d 18, 26 (1st Cir. 2000) ("If the federal statute in question demands national uniformity, federal common law provides the determinative rules of decision."). That said, the First Circuit has observed that "the federal standard for when it is proper to pierce the corporate veil is notably imprecise and fact-intensive. Federal courts are not bound by the strict standards of the common law alter ego doctrine which would apply in a tort or contract action. Nor is there any litmus test in the federal courts governing when to disregard corporate form. Instead, the rule in federal cases is founded only on the broad principle that a corporate entity may be disregarded in the interests of public convenience, fairness and equity." Id. (internal quotation marks and citations omitted).

employers were alter egos will bind the nonsignatory to a collective bargaining agreement between the union and the nonsignatory's alter ego." Id. at 307. The First Circuit has explained that:

> In determining whether a nonsignatory employer is an alter ego of a signatory, we consider a variety of factors, including continuity of ownership, similarity of the two companies in relation to management, business purpose, operation, equipment, customers, supervision, and anti-union animus—i.e., "whether the alleged alter ego entity was created and maintained in order to avoid labor obligations."

Id. at 308 (quoting NLRB v. Hosp. San Rafael, Inc., 42 F.3d 45, 50 (1st Cir. 1994)). None of these individual factors is determinative, and not all of them need to be present for alter ego status to be found. Id. The First Circuit has also held that in ERISA cases, wrongful motive or fraudulent intent is not required to impose alter ego liability. See id.; Hospital San Rafael, 42 F.3d at 51 ("After all, if a company merely changed its corporate form for legitimate tax or corporate reasons, it is hard to see why the new entity should be able to disregard an existing collective bargaining agreement or claim immunity when told to reinstate a worker wrongly fired by the old one. This view—that a wrongful motive is not required—is shared by most other circuits."). Recognizing that "'alter ego' cases have serious consequences for each party to that dispute," the First Circuit has observed that "[t]he cases are largely fact-driven, and [that] general statements of doctrine go only so far." Langone v. William Walsh, Inc., No. 96-1105, 1996 U.S. App. LEXIS 30582, *2 (1st Cir. Nov. 20, 2996).

In the typical situation, the alter ego doctrine is applied in cases where a successor (non-signatory) company is created and disguised as a continuance of the prior (signatory) company, but it can also be applied in cases where the two companies operate in parallel. See Belmont Concrete Corp., 139 F.3d at 307. And it can be applied in cases where the signatory company (the union arm of the double-breasted operation) is created after the non-signatory company (the non-

union arm) has been operating for some time. Indeed, as another session of this Court recently noted:

> [T]he order of creation of the union and non-union aspects of the double-breasted operation is not determinative for purposes of "alter ego" liability. . . . After all, whatever the timing in which the union and non-union parts of a double-breasted operation were established, the mere existence of that parallel structure makes it possible to skirt CBA obligations by siphoning off union work to the non-union affiliate.

United States v. Thompson, 207 F. Supp. 3d 106, 111 (D. Mass. 2016) (Saris, J.).

That said, simply showing that two companies are intertwined is not enough to prove liability under the alter ego doctrine. The First Circuit has cautioned that the alter ego "doctrine is not a formalistic mechanism for reflexively regarding distinct jural entities as legally interchangeable whenever the entities' relationship is marked by a sufficient number of the doctrine's characteristic criteria. . ." A.A. Bldg. Erectors, 343 F.3d at 21. "Rather, the doctrine is a tool to be employed when the corporate shield, if respected, would inequitably prevent a party from receiving what is otherwise due and owing from the person or persons who have created the shield." Id. at 21-22.

    b. Discussion

        i. Defendants' motion for summary judgment

On Defendants' motion, viewing the facts in the light most favorable to Plaintiffs, the record establishes that Plaintiffs have put forth sufficient evidence that Defendants Accurate, the union company, and Engineered, the non-union company, were physically and operationally intertwined.

Accurate was incorporated in 1991, almost twenty years after Engineered was founded, and the two companies operated in parallel until they both ceased operations in late August 2018. They were both dissolved on the same day—December 31, 2018. At all times, the two companies

were owned by Mr. Frank Franzone. The Secretary of State filings for both companies list their business as "contractors, concrete," and both companies performed the same kind of work— gypsum and lightweight cellular concrete work.[10] Both companies operated out of the same building, which was owned by Mr. Franzone. The companies did not have the same street address—Engineered's address was 34 Newark Street, Haverhill, Massachusetts; Accurate's was 36 Newark Street, Haverhill, Massachusetts—but there is a single entrance into the building, and the signage on the front of the building had only one name—"Engineered Concrete Products." The companies were run and managed from that shared building. The offices of Accurate were on one side of the building, those of Engineered were on the other.

The two companies also shared equipment, materials and vehicles and did not charge each other for the use of the other's equipment, materials, or vehicles. The companies used a single email address and shared a single website, www.accurateengineeredconcrete.com, which stated that "[f]or over 50 years, the companies of Frank J. Franzone, Inc. have offered quality workmanship and innovative solutions to your concrete needs." Doc. No. 1 ¶ 24; Doc. No. 1-6.

The same person, Ms. Cynthia Zangari, was responsible for all administrative work for both companies, including accounts receivable, scheduling, collecting workers' time sheets and managing payroll, communicating with customers, and reception work. Ms. Zangari did not separately record the time she spent working for each company. The two companies used the same accountant, the same payroll company, and the same attorney, and they were insured under a single umbrella policy.

---

[10] Defendants dispute that the two companies performed the same kind of work, but several witnesses, including Mr. Franzone, testified to that effect in their depositions. In any event, Defendants do not dispute that the two companies performed substantially the same kind of work.

The two companies had the same regular workforce and had a single scheduling system for their employees. Daily work assignments were posted on a single bulletin board in the shared garage of the companies' shared office building. The posting would indicate whether the day's job was union (Accurate) or non-union (Engineered). The employees would report to the companies' shared building each day to get their work assignments, and to pick up their equipment and vehicles, and they would return to the shared building at the end of the day. The same foremen supervised the field crew, regardless of whether the jobs were union (Accurate) or non-union (Engineered). The two companies did not perform work at the same time; only one would perform work on any given day.

The companies' shared regular workforce comprised members of the union[11] and two forepersons who were members of the International Union of Operating Engineers Local 4 ("Local 4"). For some number of years after it signed on to the CBAs at issue in 1992, Accurate paid its union laborers the union rate for each hour they worked, regardless of whether they worked on union or non-union jobs, and Accurate submitted contributions to the Funds accordingly. However, between the beginning of 2011 until the end of August 2018, Accurate paid its union laborers the union rate (and made corresponding contributions to the Funds) only when those laborers worked on union jobs. When those same union employees worked for Engineered (the non-union arm of the operation), doing the same kind of work,[12] sometimes for the same general contractors, they were paid the (lower) non-union rate and Accurate made no contributions to the Funds for those hours.

---

[11] "The union" is the Massachusetts and Northern New England Laborers District Council. See supra n.1.

[12] Defendants contend the two companies performed different work. The type of work of both companies performed falls within the terms of the CBAs at issue as explained later in the Court's discussion of damages.

The two companies used the same process of bidding for jobs. Mr. Franzone was responsible for estimating and submitting the bids for each job and would provide contractors either an Accurate (union) or an Engineered (non-union) bid—sometimes one of each—based on what the contractor requested or what Mr. Franzone believed the contractor wanted. The two companies sometimes bid the same projects, and occasionally made mistakes with respect to which company's name appeared on which bid or contract.

These facts, which are not in dispute, show that Accurate and Engineered had the same owner and the same business purpose, were operated out of the same location and run by the same people, had the same workforce, and shared equipment. Drawing all inferences in favor of the Plaintiffs, as the Court must on Defendants' motion for summary judgment, the Court concludes that a reasonable fact finder could find that Engineered and Accurate were physically and operationally intertwined and thus Engineered was an alter ego of Accurate during the relevant period. Although there is no evidence that Defendants' double-breasted corporate structure was created to avoid any obligations—indeed, Accurate (the union company) was founded almost two decades after Engineered (the non-union company) had been operating—a reasonable fact finder could conclude that after paying its union laborers the union rate and making corresponding benefit contributions for many years, Accurate began to take advantage of the corporate structure starting in 2011 (or earlier) to avoid having to make those contributions. See, e.g., Thompson, 207 F. Supp. 3d at 111 ("[W]hatever the timing in which the union and non-union parts of a double-breasted operation were established, the mere existence of that parallel structure makes it possible to skirt CBA obligations by siphoning off union work to the non-union affiliate."). This is especially so given the shared workforce used by the two companies. Therefore, Defendants' motion for summary judgment of no liability under the alter ego theory is DENIED.

ii. <u>Plaintiffs' motion for summary judgment</u>

On Plaintiffs' motion, even viewing the evidence in the light most favorable to Defendants, as the law requires, largely for the reasons explained above, Plaintiffs have put forth sufficient evidence showing that the two parts of Defendants' double-breasted operation were physically and operationally intertwined. There is no contrary reasonable conclusion on this record under the applicable standard. But whether Defendants "inequitably" took advantage of the corporate structure to avoid obligations "otherwise due" to the union members, <u>A.A. Bldg. Erectors</u>, 343 F.3d at 21, remains an open question. Defendants have put forth evidence that starting in 2009, when the economy was in a deep recession and the construction industry had ground to a halt, Accurate tried but failed to secure union work and was forced to take on more and more non-union work to remain in business. Drawing all inferences in favor of Defendants, as the Court must on Plaintiffs' motion for summary judgment, though close, a reasonable fact finder could find that Defendants (a) shifted their focus toward non-union work in a down economy and/or (b) ceased providing the arguably unrequired benefit contributions to the union Funds for non-union work as the economy and the number of union jobs waned.[13] For this reason, Plaintiffs' motion for summary judgment of liability under the alter ego theory is DENIED.

2. <u>Single employer theory of liability</u>

a. <u>Legal Standard</u>

Under the single employer theory, a non-signatory to a CBA may be liable for unpaid benefit contributions of a signatory if the two entities, though nominally distinct, comprise a single unit. <u>Langone v. C. Walsh Inc.</u>, 864 F. Supp. 233, 238 (D. Mass. 1994) ("[S]ingle employer status

---

[13] Plaintiffs contend that in some instances Accurate failed to make contributions for the hours spent traveling to/from Accurate's union jobs, in contravention of the CBAs at issue. But Plaintiffs' damages assessment does not appear to include any such unpaid travel hours, so this issue is not before the Court.

is marked by an absence of an 'arm's length relationship found among unintegrated companies.") quoting <u>Penntech Papers, Inc. v. NLRB</u>, 706 F.2d 18, 25 (1st Cir. 1983). This doctrine applies primarily "in the case of two ongoing businesses . . . treat[ed] as a single employer on the ground that they are owned and operated as a single unit." Hospital San Rafael, 42 F.3d at 50.. To apply this doctrine, however, Plaintiff must also establish that the entities' employees constitute a single appropriate bargaining unit <u>C.E.K. Indus. Mechanical Contractors, Inc. v. NLRB</u>, 921 F.2d 350, 353-54 (1st Cir. 1990) ("A finding of single employer status does not mean that one business is bound by a union contract signed by another, absent an additional finding that the employees of each constitute a single appropriate bargaining unit.")

b. <u>Discussion</u>

The parties both move for summary judgment under the single employer theory of liability. The Court first considers the issue on Plaintiffs' motion for summary judgment and thus draws all reasonable inferences in Defendants' favor. Likewise, the Court resolves all disputes of genuine material fact in Defendants' favor.

For the reasons discussed above with respect to alter ego theory of liability, the Court finds that Plaintiffs have put forth sufficient evidence that Accurate and Engineered had the same owner and the same business purpose, were operated out of the same location and run by the same people, had the same workforce, and shared equipment. As such, they were physically and operationally intertwined and comprised a single unit.

Turning to the single bargaining unit issue, the circuits are split over whether the District Courts or the National Labor Relations Board (NLRB) has jurisdiction in the first instance to decide this question. <u>See, e.g.</u>, <u>Brown v. Sandimo Materials</u>, 250 F.3d 120, 129-30 (2d Cir. 2001)

(noting split between the Fifth and Ninth Circuits). The First Circuit has not yet weighed in on this question.

Defendants present no argument as to why the Court does not have jurisdiction to decide the question under the circumstances of this case. See Doc. No. 90 (Defendants' cross motion). Nor do they respond to any of Plaintiffs' arguments that the Court does have such jurisdiction or to the cases Plaintiffs cite in support of their arguments. See Doc. No. 105 (Plaintiffs' opposition); Doc. No. 114 (Defendants' reply).

The Court concludes that it does have jurisdiction to decide the question where, as here, there has been no prior or parallel resort to the NLRB by either party. See, e.g., Massachusetts State Carpenters Annuity Fund v. Cardarelli Const. Co., 106 F.R.D. 250, 252 (D. Mass. 1985) ("[T]here is authority for the proposition that courts do have authority to decide the [single employer] issue when there has been no prior resort to the NLRB") (citing Carpenters Local Union No. 1846 etc. v. Pratt-Farnsworth, Inc., 690 F.2d 489, 513-16 (5th Cir. 1982)). In so doing, the Court follows the majority of courts that have concluded that single employer claims in ERISA collections actions address Defendants' contractual obligations, not principles of labor law (such as unfair labor practices), which have traditionally been the domain of the NLRB. See, e.g., Dist. No. 1, Pac. Coast Dist., Marine Eng'rs Beneficial Ass'n, AFL-CIO v. Liberty Mar. Corp., 815 F.3d 834, 843 (D.C. Cir. 2016) (district court had jurisdiction to decide representational issues arising under contract in Labor Management Relations Act § 301 claim); Sandimo Materials, 250 F.3d at 127-28; Pratt-Farnsworth, Inc., 690 F.2d at 515-519; Moriarty v. Larry G. Lewis Funeral Directors Ltd., 150 F.3d 773, 776 (7th Cir. 1998); Trustees of Colorado Statewide Iron Workers Joint Apprenticeship & Training Tr. Fund v. A & P Steel, Inc., 812 F.2d 1518, 1525–27 (10th Cir. 1987);

Int'l Bhd. of Elec. Workers, Local 613 v. Fowler Indus., Inc., 884 F.2d 551, 554-56 (11th Cir. 1989).

On the merits, Defendants argue that the factors the Court must consider to determine whether Defendants' employees constitute a single appropriate bargaining unit "are unknown." Doc. No. 90 at 16-17. Not so. The single appropriate bargaining unit is a common labor law doctrine and has been addressed and discussed by the NLRB and by federal courts in many cases. Courts in the First Circuit follow the NLRB's "community of interest" test, which asks whether the employees of the two entities at issue share a "community of interest." Nightingale Oil Co. v. NLRB, 905 F.2d 528, 535 (1st Cir. 1990) (citing South Prairie Constr. Co. v. International Union of Operating Engineers, 425 U.S. 800, 805 (1976)). That question, in turn, requires examination of several factors, none of which is dispositive. They include "among other things, the level of employee interchange, the extent of union organizing, the history of collective bargaining, the desires of the affected employees, the employer's organizational framework, and the similarity in skills, employee benefits, wages and hours of work." Id. (citing Friendly Ice Cream Corp. v. NLRB, 705 F.2d 570, 575 (1st Cir. 1983)).

Plaintiffs note that "[b]ecause the construction industry uses [Section] 8(f) pre-hire agreements where a union represents a signatory employer's employees regardless of the employees' expressed interest in representation, certain elements of the above formulation do not apply (e.g. extent of organizing)." Doc. No. 105 at 8.[14] They go on to observe that "[a]lthough the First Circuit has yet to apply the doctrine in the construction industry, other courts have done

_____

[14]     Section 8(f) of the National Labor Relations Act "permits unions and employers in the construction industry to enter into collective-bargaining agreements without the union's having established that it has the support of a majority of the employees in the covered unit. The provision therefore creates an exception to Section 9(a)'s general rule requiring a showing of majority support." Staunton Fuel & Material, Inc. & Mengelkamp, 335 N.L.R.B. 717, 718 (2001).

so. In the Second Circuit, courts have identified the following factors as relevant in a pre-hire arrangement: 'operational integration, geographic proximity, common supervision, similarity in job function and degree of employee interchange.'" Id. (citing LaBarbera v. Cretty Enterprises, Inc., 2007 WL 4232765 (E.D.N.Y. 2007), in turn citing Sandimo Materials, 250 F.3d at 128 n.2). Defendants do not respond to Plaintiffs' argument regarding the applicability of the test to Section 8(f) agreements in the construction industry, see generally Doc. No. 114, and contend only that "Plaintiffs do not explain why this Court should follow the Second Circuit test," Doc. No. 90 at 16. Defendants offer no alternative test for the Court to follow, and no reason to suggest that the Second Circuit test is inappropriate or that the Court should not follow it here. Discerning no such reason, the Court adopts the test and applies it to the facts presented by the parties.

Plaintiffs put forward evidence that the enumerated factors in the community of interest test—operational integration, geographic proximity, common supervision, similarity in job function, and degree of employee interchange—are sufficiently met as a matter of law. As noted above in the context of the alter ego theory of liability, Defendants Accurate (union) and Engineered (non-union) were at all times owned by Mr. Franzone. The two companies performed the same work, with shared equipment, from the same building, with the same employees and the same supervisors, often for the same general contractors. The same office manager, Ms. Cynthia Zangari, was responsible for scheduling, collecting workers' time sheets and managing payroll for both companies.

Because Defendants present no evidence of a genuine issue of material fact, and because the record is not susceptible—even drawing all reasonable inferences in Defendants' favor—of supporting a different conclusion or a failure of proof for Plaintiffs, the Court finds that there is no genuine issue of material fact that at all relevant times Defendants constituted a single employer,

and therefore GRANTS Plaintiffs' motion for summary judgment on single employer liability. For this same reason, Defendants' motion necessarily fails and the Court DENIES Defendants' motion for summary judgment on this issue.

D. Damages

In the event an employer is found liable under Section 515 of ERISA, the Court shall award the plaintiff employee benefit plan the unpaid contributions, interest on the unpaid contributions at the rate "provided under the plan," plus liquidated damages in an amount equal to the interest due on the unpaid contributions or twenty percent of those contributions, whichever is greater, as well as reasonable attorneys' fees and costs, and "such other legal or equitable relief as the court deems appropriate." 29 U.S.C. § 1132(g)(2).[15] These awards are mandatory. Id. (in the event a plan wins a judgment, "the court shall award the plan the enumerated statutory damages.") (emphasis added); Laborers Health & Welfare Trust Fund v. Advanced Lightweight Concrete Co., 484 U.S. 539, 547 (1988). At the hearing, Defendants conceded that if Plaintiffs prevail, they are entitled to each of these forms of relief.

---

[15]    The governing statute, 29 U.S.C. § 1132(g)(2), provides:

In any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section 1145 of this title in which a judgment in favor of the plan is awarded, the court shall award the plan—

(A) the unpaid contributions,

(B) interest on the unpaid contributions,

(C) an amount equal to the greater of—

(i) interest on the unpaid contributions, or

(ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A)

(D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and

(E) such other legal or equitable relief as the court deems appropriate. For purposes of this paragraph, interest on unpaid contributions shall be determined by using the rate provided under the plan, or, if none, the rate prescribed under section 6621 of title 26.

Plaintiffs move for summary judgment that they are entitled to delinquent contributions in the amount of $670,998.39 under the alter ego theory of liability, and in the amount of $539,259.76 under the single employer theory of liability. Doc. No. 68 at 19. Plaintiffs explain that their auditor, Christopher Ray, arrived at these amounts after conducting a multi-day, onsite review of Engineered's payroll records. Id. (citing Doc. No. 106 ¶ 79). Ray arrived at the former amount by tallying the number of hours worked for Engineered by all laborer employees of either Defendant between January 1, 2011 and the end of August 31, 2018, and then inputting those numbers into Excel spreadsheets that were pre-populated with the current and historic contribution rates of each of the CBAs at issue. Doc. No. 68 at 19; Doc. No. 69-11 at 3 (Amended Supplemental Answer to Interrogatory No. 14); Doc. No. 106 ¶¶ 79, 84-85, 87. Plaintiffs identified Defendants' laborer employees from Defendants' payroll records, which listed only office administrators, operators, and laborers. Doc. No. 106 ¶ 90. Using a computer program, Ray then multiplied the number of laborer hours by the contribution rates in effect at the time the hours were worked to arrive at the amount of contributions owed for the relevant time period. Doc. No. 68 at 19; Doc. No. 106 ¶ 89.

Ray calculated the unpaid contributions under the single employer theory of liability in the same way, except that he included only the number of hours worked for Engineered by laborer employees of Engineered who worked for (or "crossed over" between) Accurate and Engineered during the same time period.[16] Doc. No. 68 at 19; Doc. No. 69-11 at 3 (Amended Supplemental Answer to Interrogatory No. 14); Doc. No. 106 ¶¶ 79, 84-85, 88-89. Plaintiffs explain that "the

---

[16] Plaintiffs explain that "[t]he Funds took a narrower approach to single employer damages based on consideration of the single appropriate bargaining unit factors (e.g. community of interest, operational integration and degree of employee interchange)." Doc. No. 68 at 19 n.8. Nonetheless, the Plaintiffs contend they can obtain the larger award under the single employer theory, though they have not sought that on summary judgment.

hours for these 'crossover' laborer employees represent eighty (80) percent of the total hours worked by Defendants' employees in that time period." Doc. No. 105 at 9.

As noted above, in arriving at their damages assessment, Plaintiffs relied on the payroll records of Defendant Engineered. The payroll records did not specify either the jobsites Engineered's laborer employees worked for any of the hours they recorded, nor the nature of the work they performed. Plaintiffs therefore treated all the laborer hours included in Defendants' payroll records as hours worked in Massachusetts and specifically in Zone 2—Essex County, which includes Haverhill, where Defendants' office building is located. The applicable contribution rates for Zone 2 are lower than for Zone 1, the greater Boson area, where Engineered also performed work. Plaintiffs also treated all the hours included in the payroll records as hours worked on jobs covered by the CBAs at issue.

In addition to the remittance of unpaid benefit contributions, Plaintiffs also seek 10% interest per annum on these respective amounts, plus liquidated damages in the amount of interest accrued (because the interest amounts under either theory of liability exceed the alternative liquidated damages penalty of 20% of unpaid contributions).

Defendants do not cross-move for summary judgment on damages; they do assert various objections to the basis for Plaintiffs' damage claims, each of which is addressed below.

1. Defendants' arguments regarding Plaintiffs' damages calculations.[17]

a. Admissibility of Plaintiffs' damages-related evidence

Defendants first argue that Plaintiffs' damages calculations are inadmissible because the audit performed by Plaintiffs does not constitute a record kept in the ordinary course of business

---

[17] In addition to the arguments addressed in this section, Defendants also argue that "[a]s discussed above [in Defendants' discussion of the alternative theories of liability], the Plaintiffs' unpaid benefit contribution claims are an all or nothing proposition not based on the Defendants' alleged discrete breaches of the CBAs, but instead based on

but was instead generated solely for this litigation.  Doc. No. 90 at 22-23.  This argument misses the mark.  Plaintiffs do not submit the summary of their audit as a record kept in the ordinary course of business, but instead as a summary of their damages calculations based on Defendants' own payroll records, which were kept in the ordinary course of business.  See Fed. R. Evid. 1006 ("The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court.").

Defendants next contend that because Engineered (the non-union company) was not a signatory to any CBAs, it had no "obligations to maintain records in such a way as to allow for period[ic] audits of its records."  Doc. No. 90 at 22-23.  Therefore, Defendants argue, "there can be no presumption of regularity" as to Engineered's payroll records.  Id. at 23.  To the extent this is a general attack on the records, it fails.  The records in question, which comprise the basis of Plaintiffs' damages calculations are Engineered's own payroll records, kept in the ordinary course of business and reflecting its payments to employees for services rendered.  In addition, Defendants identify no specific or general inaccuracy with Engineered's own payroll records, thus the Court rejects this objection and accepts the documents as business records.

Moreover, Engineered and Accurate constitute a single employer.  In these circumstances, the Court applies the ERISA presumption of regularity.  Under ERISA, the employer bears the obligation to maintain records sufficient to allow funds to calculate the benefit contributions they are due.  Brick Masons Pension Tr. v. Indus. Fence & Supply, Inc., 839 F.2d 1333, 1338 (9th Cir. 1988).  Thus, the First Circuit has held that when an employer fails to keep adequate records, and plaintiffs can show that at least some employee performed covered work that was not reported to

the Defendants' alleged failures to operate separately and to maintain separate corporate forms.  However, as also discussed above, there is no causation between the Plaintiffs' claims and the Defendants' alleged conduct."  Doc. No. 90 at 22.  The Court understands this argument as generally contesting liability.  To the extent any causation element is at issue under the alter ego theory of liability, the Court has addressed it above.

the funds, "the presumption is that the employer is liable for all hours potentially representing covered work." Cent. Pension Fund of Int'l Union of Operating Eng'rs & Participating Employers v. Ray Haluch Gravel Co., 695 F.3d 1, 10 (1st Cir. 2012). To rebut this presumption, the employer must "separate wheat from chaff and offer some evidence that will allow a court to calculate the extent of covered work previously unreported." Id. This Defendants have failed to do.[18]

Alternatively, Defendants argue that Plaintiffs' audit summary is inadmissible under Federal Rule of Evidence 1006 because the hourly contribution rates applied to the payroll records are inadmissible; these, in turn are inadmissible because Defendants lack access to the computer program Ray used to calculate damages. Doc. No. 90 at 23. There is no evidence Plaintiffs improperly withheld in discovery the spreadsheets containing the contribution rates and hours worked, which comprised the basis of Plaintiffs' damages assessment. In any event, Defendants have the contribution rates Plaintiffs used and the payroll records upon which Ray relied, so they have all they need to challenge the calculations. Therefore, the Court rejects Defendants' objection that the summary of Plaintiffs' damages assessment is inadmissible.

### b. Accuracy of Plaintiffs' damages assessment

Defendants make several arguments that Plaintiffs' damages assessment is not accurate. The Court addresses each in turn, viewing the record in the light most favorable to Defendants.

First, Defendants contend that approximately 70% of the hours included in Plaintiffs' damages calculations were spent performing Maxxon Gyp-Crete work, which Defendants contend

---

[18]     Defendants' contention that the cited cases are inapposite because the First and Ninth Circuits applied the presumption that the employer is liable for all hours potentially representing covered work "at trial not at summary judgment," Doc. No. 114 at 5, misses the mark. The same presumption applies in both contexts. Defendants' alternative argument that the cited cases are inapposite because they addressed the failure of the signatory employer to keep adequate records, not the failure of the non-signatory employer to do so, id. at 5-6, also misses the mark in light of the Court's finding that Defendants constitute a single employer. Defendants also argue that Plaintiffs' review of Engineered's payroll records did not constitute an "audit" because Engineered was not a signatory to any of the CBAs at issue "and therefore did not have any obligations to maintain records in such manner as to allow for periodic audits." Doc. No. 106 ¶ 79 (response). This argument fails for the same reasons.

"is not covered by the CBAs because, among other reasons, it is not a concrete, aggregate or grout." Doc. No. 90 at 24.

The Eastern Massachusetts Building and Site Construction CBA—the principal CBA at issue here (and the one Plaintiffs apply to support their damage calculations)[19]—makes clear that Maxxon Gyp-Crete work is covered under its terms. Covered work under Article XXII, Section 13, of the CBA includes (a) the "mixing, handling, conveying [and] pouring" of concrete or aggregates, (b) the "placing of concrete or aggregates, whether poured, pumped, gunnited, or placed by any other process," (c) the placement of "under-slab insulation," (d) "[a]ll…spreading, flowing, puddling, leveling . . . of concrete or aggregates," as well as (e) "concrete specialist work" such as "the preparation of subfloor surfaces." Doc. No. 69-1, Art. XXII § 13; Doc. No. 69-2 (same). Section 13 also provides that "[t]he Laborers' Concrete Specialist shall have jurisdiction over all specialist activity not limited to the above mentioned examples." Id. Plaintiffs point out that Maxxon itself describes its Gyp-crete product as "gypsum concrete, poured floor underlayments." Doc. No. 106 ¶ 164 (response) (citing Doc. No. 106-30, Maxxon Corporation Evaluation Report, at 2).

Defendants respond that the cited document "is consistent with Franzone's averments. The document refers to both 'gypsum concrete underlayment' products and, separately, 'underlayment' products. Section 4, installation, refers to the latter and provides that 'underlayment,' and not 'gypcrete concrete underlayment,' is installed by mixing it with sand and water. That is consistent with Franzone's averments that the product is not a concrete or aggregate and is mixed with sand and water. Franzone refers to the product as Maxxon Gyp-Crete because that is the popular name used for the whole family of products." Doc. No. 114 at 8. Defendants' argument misses the

---

[19] See supra n.4.

mark. The "underlayments" to which the document refers in Section 4, titled "Installation," are the same underlayments to which the rest of the document refers—"Maxxon Gypsum Concrete Underlayments," and "Therma Floor® and Rapid Radiant® gypsum concrete poured floor underlayments," described under Section 2, titled "Uses." The report as a whole indicates that it refers to products within the "Division" titled "Concrete." Therefore, the Court rejects Defendants' objection that Maxxon Gyp-Crete work is not covered under the CBAs at issue.

Second, Defendants assert that Engineered performed "approximately 18% of its work outside the CBAs' jurisdiction," Doc. No. 94 at 24, because the work was performed out-of-state and argue on this basis that Plaintiffs cannot recover on this 18% of their damages claim. Because Defendants make no geographic objection to the other 82% of Plaintiffs' damages claims, the Court ALLOWS Plaintiffs' motion for summary judgment as to the remaining 82% occurring within the CBA's jurisdiction. As for the 18%, even without documentary support, the affidavit of Mr. Franzone attesting that Engineered performed "approximately 18% of its work outside the CBAs' jurisdiction," Doc. No. 92 ¶ 31, which assertion is based on an approximation derived from revenue statements, id. ¶¶ 32-34, raises a genuine issue of material fact as to whether Plaintiffs can establish that 18% of the laborer hours were performed within the jurisdiction of the CBA. Thus, as to that issue, Plaintiffs' motion for summary judgment is DENIED.

Third, Defendants argue that Plaintiffs' assessment of damages is unreliable "because Ray incorrectly added or transcribed hours." Doc. No. 90 at 25 (citing Doc. No. 106 ¶¶ 176-79). This creates a genuine issue of material fact, as to the two specific examples identified by Defendants, of discrepancies between the hours listed on Plaintiffs' spreadsheet showing the basis of their damages assessment and Defendants' original payroll records. These two isolated examples do not create a genuine issue of material fact as to the other calculations.

Fourth, Defendants argue that Plaintiffs' assessment of damages under the single employer theory of liability is incorrect because it includes the hours of cross-over employees—employees of both Accurate and Engineered—who did not work for Accurate during the entire period for which Plaintiffs are claiming damages, and so do not properly count as "cross-over" employees for that whole period. Doc. No. 90 at 18 ("The Defendants have identified at least three employees who were not union members (and did not work for Accurate) until the summer and fall of 2014, one employee who was not a union member (and did not work for Accurate) until the summer of 2015, and two employees who were not union members (and did not work for Accurate) for approximately a year to a year and a half in the 2012 timeframe."); id. at 25-26. Defendants contend that under the single employer theory of liability, which requires a single appropriate bargaining unit, the only laborer employees that count are union members. Doc. No. 90 at 17-18. This creates a genuine issue of material fact as to when the five employees they specifically identify properly became "cross-over" employees. It does not create a genuine issue of material fact as to the other calculations.

Fifth, Defendants dispute some components of the contribution rates applied by Plaintiffs while conceding the validity of other components. For example, for work performed in December 2012, Defendants concede that the appropriate contribution rate for delinquent contributions is (at least) $19.55.[20] See Doc. No. 106 ¶ 181. Defendants accept the $19.55 contribution rate and as to that amount, which is not disputed, the Court ALLOWS Plaintiffs' motion for summary judgment.

---

[20] This rate is made up of the following components: $7.10 for the Health and Welfare Fund, $7.05 for the Pension Fund, $5.40 for the Annuity Fund, $0.70 for the Training Fund, and $0.20 for the Legal Services Fund.

But Plaintiffs seek more. First, Plaintiffs seek the Zone 1 (Greater Boston) contribution rate of $5.40 for the Annuity Fund rather than the Zone 2 (Essex County) rate of $4.50 that is applied by Defendants (and which is included in the $19.55 rate). Defendants object to this higher Zone 1 rate and Plaintiffs have not established a basis to apply the Zone 1 rate across the board. Second, Plaintiffs seek damages for unpaid contributions to the Labor Management Cooperate Trust ($0.15), the Unified Trust ($0.50), the Health and Safety Fund ($0.15), and the Massachusetts Construction Advancement Program ($0.10), which are funds listed in the CBAs at issue but are not named plaintiffs in this action. Defendants object not to the rates of each of these four funds, but to awarding any damages for funds not named as Plaintiffs and Plaintiffs have not established a basis to recover on behalf of these funds.[21] Accordingly, the Court DENIES Plaintiffs' motion for Summary judgment as to these disputed rate components.

The parties have the same rate dispute for each of the other periods within the relevant time frame for damages; thus, the Court applies its ruling to those other periods. That is, the Court ALLOWS Plaintiffs' motion for summary judgment for damages as to the contribution rates in effect at each time period, as set out in Docs. No. 69-1, 69-2, and 106-32, for each of the Plaintiff Funds for Zone 2. Plaintiffs' entitlement to delinquent contributions for work performed in Zone 1 and their entitlement to contributions to funds that are not parties to this action, if any, are issues to be determined at trial.

And finally, Defendants argue that Plaintiffs fail to apportion the damages among themselves. Doc. No. 90 at 25. As part of their normal collections practice, Plaintiffs receive one

---

[21] Although Defendants refer to "the four funds not named in this action," they identify only the Labor Management Cooperate Trust, the Unified Trust, and the Massachusetts Construction Advancement Program as funds with respect to which, they argue, Plaintiffs are not entitled to claim delinquent contributions. Doc. No. 106 ¶ 181. The Court understands Defendants' argument to be that Plaintiffs are not entitled to claim delinquent contributions for any of the four funds that, though listed in the CBAs at issue, are not named parties to this action.

check, which they then distribute among themselves pro rata. <u>Doc. No. 90-6</u> (Mandarini Dep. Tr.) at 8-9 (23:9 – 27:2). How Plaintiffs decide to apportion among themselves any damages they may be awarded in this action is not at issue here—it is not something Plaintiffs have asked the Court to resolve and not something Defendants have standing to raise.

c.   <u>Temporal scope of damages</u>

Plaintiffs claim damages for unpaid benefit contributions for the time period between January 1, 2011 and the end of August 2018. Defendants make three arguments contesting the temporal scope of the applicable damages period.

First, Defendants argue that to the extent that they are found liable under either the alter ego or single employer theory of liability, "the factual question would remain as to when exactly did they become alter egos of each other or be treated as a single employer." <u>Doc. No. 90 at 27</u>. The record does not establish a genuine issue of material fact concerning when Defendants become physically and operationally intertwined. Rather, under the applicable summary judgment standard, it supports only the conclusion that they were so intertwined at all relevant times.

Second, Defendants contend Plaintiffs have not submitted evidence of the CBA rates prior to June 1, 2012 (the date when the CBAs submitted to the Court came into effect). <u>Doc. No. 90 at 26</u>. Not so. Plaintiffs submit a summary of the applicable benefit contribution rates for the time period 2011-2018. <u>See</u> <u>Doc. No. 106-32</u>.[22] Therefore, the Court rejects Defendants' objection and, with it, their argument that Plaintiffs are not entitled to damages before June 1, 2012.

---

[22]    For the reasons articulated in the Court's Order on the parties' motions to strike, Doc. No. 127, the Court has denied Defendants' motion to strike this exhibit.

Third, Plaintiffs conceded at the hearing that they cannot recover damages outside the six-year statute of limitations period, thus, the relevant damage period runs at most from the date Plaintiffs filed their suit on June 16, 2017 back to June 16, 2011.

### 2. Defendants' arguments regarding Plaintiffs' interest calculations.

Defendants do not dispute that Plaintiffs are entitled to interest on any delinquent contributions they may be due, but they dispute that the applicable interest rate under the CBAs is 10% per annum and contend instead that the 10% interest rate provided for under the CBAs at issue "is a flat charge of 10% and no more," without regard to time—a fundamental component of the concept of interest. Doc. No. 90 at 28. Defendants' contention is contrary to the provisions of the CBAs and to ERISA.

Article XIX, Section 2, of the Eastern Massachusetts Building and Site Construction CBA provides that "[i]n accordance with Section 5.02(g)(2) of ERISA [29 U.S.C.§ 1132(g)(2)], as amended, the Trustees do establish the rate of interest to be paid by Employers on delinquent contributions to be 10 percent 10% [sic] and further, liquidated damages shall be assessed in an amount of twenty percent (20%) of the amount of the delinquency, or such higher percentage as may be permitted under Federal or State Law . . ." Doc. No. 69-1, Art. XIX § 2; Doc. No. 69-2 (same). Article XIX, Section 3, of the CBA provides that employers liable for delinquent payments shall be liable for "interest at the rate stated in Section 2 above from the date when payment was due to the date when payment was made." Doc. No. 69-1, Art. XIX, § 3; Doc. No. 69-2 (same). And ERISA provides for liquidated damages in an amount equal to the interest due on the unpaid contributions or twenty percent, whichever is greater. 29 U.S.C. § 1132(g)(2)(C).

Defendants argument borders on the frivolous. Defendants' contention that the interest provided for by the CBA is a 10% flat fee effectively converts the interest provision into a second

liquidated damages provision, which makes little sense, either as a matter of statutory interpretation, contract interpretation or as a matter of practice. For one thing, the CBA already provides for a separate liquidated damages award. And, as a practical matter, interpreting the interest provision as a flat fee would mean that contributions that were delinquent for one month or six years would be subject to the same interest payment. The CBA provisions plainly establish that the interest is a rate applied per annum not a flat penalty of ten percent as Defendants contend. That the statute also provides for an additional liquidated damages penalty, a point Defendants concede, confirms the point. The Court holds as a matter of law that Plaintiffs are entitled to interest on any delinquent contributions they may be due at the rate of 10% per annum.

3. Liquidated damages, attorneys' fees, and costs.

Defendants do not contest the provision entitling Plaintiffs liquidated damages in the amount of interest owed or 20%, whichever is greater, in the event Defendants are found liable for violating ERISA. The Court therefore GRANTS Plaintiffs' motion for summary judgment that they are entitled to liquidated damages in an amount equal to the interest accrued on Defendants' delinquent contributions or 20% of those contributions, whichever is greater, in an amount to be determined at trial. Plaintiffs are also entitled to an award of attorneys' fees and costs, which will be determined post-trial.

IV.     CONCLUSION

Defendants' motion for summary judgment (Doc. No. 89) is DENIED. Plaintiffs' Motion for Summary Judgement (Doc. No. 66) is ALLOWED IN PART and DENIED IN PART as explained herein. The bench trial in this matter will commence on January 27, 2020 at 9:00 A.M.,

proceeding day to day, from 9:00 A.M. to 1:00 P.M., until completed,[23] at which the Court will determine the following:

1. Whether Plaintiffs have established that Engineered is the alter ego of Accurate, a question which primarily turns on the last prong of the analysis, as the Court has resolved on summary judgment the two companies were physically and operationally intertwined;

2. Damages: in particular,

    (a) whether there is a reduction of up to 18% for out-of-state work;

    (b) whether Plaintiffs can recover for the two disputed hours-related discrepancies;

    (c) when the five employees Defendants specifically identify properly became "cross-over" employees;

    (d) whether Plaintiffs can apply Zone 1 rates for any of the laborer hours at issue; and

    (e) whether Plaintiffs can recover delinquent contributions for funds identified in the CBAs at issue that are not named plaintiffs in this action.

By January 21, 2020, Plaintiffs and Defendants shall each disclose the witnesses they intend to call at trial and the documents they intend to enter into evidence. They will also file any motions in limine by the same date. By January 23, 2020, the parties shall file any objections they have to any of the witnesses or documents disclosed by the other side. The parties shall file their oppositions to the other side's motion(s) in limine by noon on January 24, 2020.

SO ORDERED.

 /s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge

---

[23] Depending on the Court's schedule, the Court will also consider taking testimony for some portions of some afternoons.